ORIGINAL

Approved:    _____
             Amanda L. Houle / Matthew J. Laroche
             Jason A. Richman/ Elinor L. Tarlow
             Assistant United States Attorneys

Before:      HONORABLE SARAH L. CAVE
             United States Magistrate Judge   20 MAG   2370
             Southern District of New York

- - - - - - - - - - - - - - - - - - x
                                    :
UNITED STATES OF AMERICA            :    **SEALED COMPLAINT**
                                    :
        - v. -                      :    Violations of
                                    :    18 U.S.C. §§ 924, 2;
GEOVANNY FUENTES RAMIREZ,           :    21 U.S.C. § 963
                                    :
                Defendant.          :    COUNTY OF OFFENSE:
                                    :    NEW YORK
- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        RAVI BALDEO, being duly sworn, deposes and says that he
is a Special Agent with the Drug Enforcement Administration ("DEA")
and charges as follows:

COUNT ONE
(Cocaine Importation Conspiracy)

        1.    From at least in or about 2009 up to and including
in or about 2020, in Honduras and elsewhere, and in an offense
begun and committed out of the jurisdiction of any particular state
or district of the United States, GEOVANNY FUENTES RAMIREZ, the
defendant, and others known and unknown, at least one of whom has
been first brought to and arrested in the Southern District of New
York, intentionally and knowingly combined, conspired,
confederated, and agreed together and with each other to violate
the narcotics laws of the United States.

        2.    It was a part and an object of the conspiracy that
GOEVANNY FUENTES RAMIREZ, the defendant, and others known and
unknown, would and did import into the United States and into the
customs territory of the United States from a place outside thereof
a controlled substance, in violation of Title 21, United States
Code, Sections 952(a) and 960(a)(1).

3.     It was further a part and an object of the conspiracy that GEOVANNY FUENTES RAMIREZ, the defendant, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

4.     It was further a part and an object of the conspiracy that GEOVANNY FUENTES RAMIREZ, the defendant, and others known and unknown, would and did, on board an aircraft registered in the United States, manufacture, distribute, and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 959(c) and 960(a)(3).

5.     The controlled substance that GEOVANNY FUENTES RAMIREZ, the defendant, conspired to (i) import into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture and distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States from a place outside thereof, and (iii) manufacture, distribute, and possess on board an aircraft registered in the United States, was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B).

(Title 21, United States Code, Section 963; and
Title 18, United States Code, Section 3238.)

COUNT TWO
(Possession of Machineguns and Destructive Devices)

6.     From in or about 2009 up to and including in or about 2020, in Honduras and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United States and for which one of two or more joint offenders has been first brought to and arrested in the Southern District of New York, GEOVANNY FUENTES RAMIREZ, the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to wit, the narcotics importation conspiracy charged in Count One of this Complaint, knowingly used and carried firearms, and, in

2

furtherance of such crime, knowingly possessed firearms, and aided
and abetted the use, carrying, and possession of firearms, to wit,
machineguns that were capable of automatically shooting more than
one shot, without manual reloading, by a single function of the
trigger, as well as destructive devices.

(Title 18, United States Code, Sections 924(c)(1)(A),
924(c)(1)(B)(ii), 3238, and 2.)

COUNT THREE
(Conspiracy to Possess Machineguns and Destructive Devices)

7.   From in or about 2009 up to and including in or
about 2020, in Honduras and elsewhere, and in an offense begun and
committed out of the jurisdiction of any particular state or
district of the United States, GEOVANNY FUENTES RAMIREZ, the
defendant, and others known and unknown, at least one of whom has
been first brought to and arrested in the Southern District of New
York, intentionally and knowingly combined, conspired,
confederated, and agreed together and with each other to violate
Title 18, United States Code, Section 924(c).

8.   It was a part and object of the conspiracy that
GEOVANNY FUENTES RAMIREZ, the defendant, and others known and
unknown, would and did, during and in relation to a drug
trafficking crime for which they may be prosecuted in a court of
the United States, to wit, the narcotics importation conspiracy
charged in Count One of this Complaint, would and did use and carry
firearms, and, in furtherance of such drug trafficking crime,
knowingly possess firearms, including machineguns that were
capable of automatically shooting more than one shot, without
manual reloading, by a single function of the trigger, as well as
destructive devices, in violation of Title 18, United States Code,
Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

The bases for my knowledge and for the foregoing charges
are, in part, as follows:

9.   I am a Special Agent with the DEA.  This affidavit
is based upon my conversations with law enforcement officers and
employees, as well as a review of documents, during the course of
the investigation. Because this affidavit is being submitted for
the limited purpose of establishing probable cause, it does not
include all the facts that I have learned during the course of the
investigation.  Where the actions, statements, and conversations

3

of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

10. Based on my review of documents and my conversations with other law enforcement officers, I have learned the following, in substance and in part:

a. From at least in or about 2004, up to and including in or about 2020, multiple drug-trafficking organizations in Honduras and elsewhere worked together, and with support from certain prominent public and private individuals, including Honduran politicians and law enforcement officials, to receive multi-ton loads of cocaine sent to Honduras from, among other places, Colombia via air and maritime routes, and to transport the drugs westward in Honduras toward the border with Guatemala and eventually to the United States.

b. For protection from law enforcement interference, and in order to facilitate the safe passage through Honduras of multi-ton loads of cocaine, drug traffickers paid bribes to public officials, including certain members of the National Congress of Honduras and the Honduran National Police.

c. For example, in October 2019, Juan Antonio Hernandez Alvarado, a former Honduran congressman and the brother of the president of Honduras, referred to below as "CC-4," was convicted at trial in this District of participating in a cocaine-importation conspiracy, related weapons violations under 18 U.S.C. § 924(c), and making false statements to the DEA in October 2016.

11. Based on my review of documents and my conversations with other law enforcement officers, I have learned the following, in substance and in part, with respect to a cooperating witness ("CW-1")[1]:

a. In or about 2009, a co-conspirator not named as a defendant herein ("CC-1"), who acted at times as an assassin for CW-1 and others, introduced CW-1 to GEOVANNY FUENTES RAMIREZ,

---

[1] CW-1 has pleaded guilty, pursuant to a cooperation agreement, to drug-trafficking, money-laundering, and weapons offenses, as well as causing 78 murders. CW-1 has been cooperating with the DEA since in or about 2013 in the hope of obtaining leniency at sentencing. Information provided by CW-1 has been corroborated in part by, among other things, consensually recorded meetings, consensually intercepted electronic communications, and information from other witnesses.

the defendant.   CC-1 told CW-1, in substance and in part, that
FUENTES RAMIREZ was participating in drug-trafficking activities
in the vicinity of the Cortés and Choloma Departments of Honduras,
and that FUENTES RAMIREZ was bribing members of the Honduran
National Police in connection with those activities.

         b.   In or about 2009, FUENTES RAMIREZ and CC-1
solicited financial support from CW-1 for use in constructing a
laboratory for manufacturing cocaine (the "Laboratory"), which was
established in the vicinity of Omoa, Cortés in Honduras.   CW-1
purchased certain property from FUENTES RAMIREZ and, in return,
provided approximately $65,000 to FUENTES RAMIREZ for use in the
Laboratory venture.

         c.   From in or about 2009, up to and including in
or about 2012, FUENTES RAMIREZ and CC-1 used the Laboratory to
produce approximately 300 to 500 kilograms of cocaine each month.
FUENTES RAMIREZ, CC-1, and others used vehicles and airplanes,
including planes dispatched from a clandestine airstrip in
Honduras that FUENTES RAMIREZ operated, to distribute their
cocaine.   FUENTES RAMIREZ and CC-1 further employed other
individuals, who worked with FUENTES RAMIREZ and CC-1 to help
produce, transport, and provide heavily armed security for  the
cocaine that FUENTES RAMIREZ and CC-1 manufactured in the
Laboratory.

         d.   On several occasions between in or about 2009
and in or about 2012, CW-1 observed FUENTES RAMIREZ and his workers
possess firearms during the course of their drug-trafficking
activities, including 9 millimeter handguns, AK-47 assault rifles,
and AR-15 assault rifles.

         e.   From in or about 2009 up to and including in
or about 2012, FUENTES RAMIREZ and CC-1 paid bribes to members of
the Honduran National Police.   In exchange, those law enforcement
officials provided security to help FUENTES RAMIREZ and CC-1
transport cocaine and provided information for FUENTES RAMIREZ and
CC-1 to avoid detection and arrest.

         f.   In or about 2011, FUENTES RAMIREZ and CC-1
told CW-1, in substance and in part, that another Honduran drug
trafficker not named as a defendant herein ("CC-2") was a financial
partner in the operations of the Laboratory, and that the
Laboratory was still producing 300 to 500 kilograms of cocaine
each month.

g.    Between in or about 2011 and in or about 2012, CW-1 learned about some of the cocaine-trafficking operations in which FUENTES-RAMIREZ and CC-1 had engaged, apart from their cocaine production.  Among other things, CC-1 told CW-1, in substance and in part, that CC-2 had received a shipment of approximately 300 kilograms of cocaine by airplane into Honduras, that FUENTES RAMIREZ had assisted in unloading the cocaine from the airplane, and that the narcotics were later seized by law enforcement.  CW-1 further learned that, in or about 2012, FUENTES RAMIREZ and CC-1 coordinated a shipment of approximately 600 kilograms of cocaine by airplane from Colombia to Honduras.

h.    In or about 2012, Honduran law enforcement raided the Laboratory.  FUENTES RAMIREZ told CW-1, in substance and in part, that after the Laboratory was raided, FUENTES RAMIREZ and CC-1 learned that a particular law enforcement officer ("Victim-1") had been involved in the investigation of the Laboratory.  FUENTES RAMIREZ told CW-1, in substance and in part, that FUENTES RAMIREZ and CC-1 found Victim-1, tied him up, and then killed him by repeatedly stabbing him.

i.    Following the raid of the Laboratory, FUENTES RAMIREZ and CC-1 continued to work with others to distribute cocaine.  For example, CC-1 told CW-1, in substance and in part, that, in or about late 2012, FUENTES RAMIREZ coordinated the receipt of approximately 275 kilograms of cocaine in Honduras that were shipped by airplane to a clandestine airstrip that FUENTES RAMIREZ controlled.  CC-1 told CW-1, in substance and in part, that in or about 2013, FUENTES RAMIREZ and CC-1 coordinated the shipment of approximately 300 kilograms of cocaine via boat, which was intercepted by law enforcement.  In or about 2013, CC-1 also asked CW-1 to invest approximately $1 million in a joint venture that CC-1 and FUENTES RAMIREZ were undertaking to ship narcotics by boat.  CW-1 did not provide the money for this joint venture.

j.    In or about 2013, CC-1 told CW-1, in substance and in part, that FUENTES RAMIREZ and CC-1 had directed an individual who worked for them as an assassin and is not named as a defendant herein ("CC-3") to murder a Honduran narcotics trafficker ("Victim-2") who had purportedly stolen narcotics from FUENTES RAMIREZ and CC-1.  With respect to the murder of Victim-2, CC-1 told CW-1, in substance and in part, that CC-3 and other men had murdered Victim-2 in Honduras with AK-47s and AR-15s.

k.    In or about 2017, while CW-1 was incarcerated, CW-1 learned that FUENTES RAMIREZ sought to resolve a dispute with CW-1 related to drug trafficking and associated violence that arose

in or about 2011 and 2012 and had resulted in, among other things, CW-1 having CC-1 killed.

12. Based on my review of documents and my conversations with other law enforcement officers, I have learned the following, in substance and in part, with respect to a witness in the investigation ("Witness-1"):

a. In or about 2013, CC-4 met with FUENTES RAMIREZ on several occasions and discussed, in substance and in part, FUENTES RAMIREZ's connections to the Laboratory. During the course of these meetings:

i. FUENTES RAMIREZ provided CC-4 with approximately $25,000, on the understanding that CC-4 would facilitate protection for FUENTES RAMIREZ from law enforcement scrutiny.

ii. CC-4 told FUENTES RAMIREZ, in substance and in part, that he was interested in access to the Laboratory in part because of its proximity to a port in Honduras.[2]

iii. CC-4 agreed with FUENTES RAMIREZ, in substance and in part, to facilitate the use of Honduran armed forces personnel as security for FUENTES RAMIREZ's drug-trafficking activities.

iv. CC-4 told FUENTES RAMIREZ, in substance and in part, that Hernandez Alvarado (CC-4's brother) was managing drug-trafficking activities in Honduras and that FUENTES RAMIREZ should report directly to Hernandez Alvarado for purposes of drug trafficking.

13. Based on my training and experience, I know that the vast majority of cocaine that is dispatched from Colombia to Honduras is ultimately imported into the United States.

---

[2] As noted above, the Laboratory was in the vicinity of Omoa, Cortés. Based on publicly available information, I know that Omoa is (i) less than approximately 15 kilometers from Puerto Cortes, Honduras which is one of the largest commercial ports in Honduras, and (ii) under 100 kilometers from Puerto Barrios, which also contains a commercial port.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of GEOVANNY FUENTES RAMIREZ, the defendant, and that he be imprisoned or bailed, as the case may be.

RAVI BALDEO
Special Agent
Drug Enforcement Administration

Sworn to before me this
25 of February, 2020

THE HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

8